J-S31016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES MAURICE CANNAVO, JR. | : | |
| | : | |
| Appellant | : | No. 1115 EDA 2023 |

Appeal from the PCRA Order Entered March 30, 2023
In the Court of Common Pleas of Chester County Criminal Division at
No(s):  CP-15-CR-0004483-2015

BEFORE:  BOWES, J., McLAUGHLIN, J., and BECK, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED DECEMBER 2, 2024**

James Maurice Cannavo, Jr., appeals from the order dismissing his Post Conviction Relief Act ("PCRA") petition. 42 Pa.C.S.A. §§ 9541-9546. He argues that trial, appellate, and PCRA counsel were ineffective, the Commonwealth violated his due process rights, and he did not knowingly, voluntarily, and intentionally reject a guilty plea offer. We affirm the PCRA court's decision rejecting Cannavo's claims raised before that court. We further conclude Cannavo's claims that PCRA counsel was ineffective for failing to raise ineffectiveness claims relating to the castle doctrine jury instruction and the sufficiency of the evidence lack merit. However, we vacate the order and remand for an evidentiary hearing regarding Cannavo's claim of PCRA counsel ineffectiveness for failing to allege trial counsel ineffectiveness regarding a voluntary manslaughter instruction.

We previously summarized the evidence at Cannavo's trial as follows:

[Cannavo] was staying at a carriage house near West Chester University on Halloween night in 2015. That night, the victim and his friends went out into the town of West Chester with minimal Halloween costumes. Some testimony indicated they were intoxicated. At 1:17 a.m., they purportedly attempted to enter what they believed to be a party around the carriage house, but were denied entry. The victim, and possibly others, subsequently banged on [Cannavo's] door. Testimony varied as to the number of times the group banged on [Cannavo's] door, though [Cannavo] testified that he heard repeated, loud strikes.

Testimony also revealed that [Cannavo] had a closed-circuit television that permitted him to see the area outside his door. [Cannavo] fired a .40 caliber semiautomatic pistol at the door, without opening it. The bullet went through the door and struck the victim[, Fletcher Grady,] through his small intestine and colon. The police would later discover that, due to [Cannavo's] prior criminal record, [Cannavo] did not lawfully possess the gun he fired at the door. The victim survived[.]

**Commonwealth v. Cannavo**, 199 A.3d 1282, 1285-86 (Pa.Super. 2018).

A criminal complaint was filed against Cannavo in November 2015, charging, among other things, recklessly endangering another person ("REAP"), aggravated assault, and simple assault.[1] An information, filed December 2015, added a charge of attempted murder.[2] The documents did not allege that the shooting had caused serious bodily injury or reference 18 Pa.C.S.A. § 1102(c). That statute provides that a person who has been convicted of attempted murder "where serious bodily injury results" is subject to maximum sentence of 40 years' imprisonment. 18 Pa.C.S.A. § 1102(c). If

_____

[1] 18 Pa.C.S.A. §§ 2705, 2702(a)(1), and 2701(a)(1) and 2701(a)(2).

[2] **See** 18 Pa.C.S.A. §§ 901, 2502(a).

serious bodily injury does not result, the maximum sentence is 20 years' imprisonment. *Id.*

At trial, Cannavo claimed he acted in self-defense. The trial court instructed the jury on the defense, but declined to give an instruction on the castle doctrine. N.T., 3/24/22, at 263-66, 289-92.

A jury convicted Cannavo in March 2017 of one count each of attempted murder and REAP and two counts each of aggravated assault and simple assault. The jury also responded "yes" to a question on the verdict sheet that asked, "If you find the defendant guilty of Attempted Murder, do you find that he caused serious bodily injury to [the victim]?" Verdict Slip, filed Apr. 3, 2017. The trial court found Cannavo guilty of persons not to possess firearms, 18 Pa.C.S.A. § 6105(a)(1).

The trial court sentenced Cannavo in June 2017, to an aggregate term of 25 to 50 years' imprisonment. Cannavo filed a post-sentence motion, which the trial court denied. Cannavo appealed, arguing the trial court erred in denying his request to instruct the jury on the castle doctrine and challenging the sufficiency of the evidence. *Cannavo*, 199 A.3d at 1286. We affirmed the judgment of sentence, and, on August 5, 2019, the Pennsylvania Supreme Court denied Cannavo's petition for allowance of appeal.

In October 2020, Cannavo filed this timely PCRA petition. The PCRA court held a three-day hearing.

Trial counsel Evan J. Kelly, Esq., testified that Cannavo received at least three plea offers – 10 to 20 years' incarceration, eight to 16 years'

incarceration, and five to 10 years' incarceration without credit for time served. N.T., Mar. 14, 2022, at 47-48. Counsel rejected the initial offer of 10 to 20 years, which occurred in October 2016. *Id.* at 48. Counsel believed he would be able to convince the Commonwealth to make a better offer. *Id.* at 49. In an October 2016 email to trial counsel, the Assistant District Attorney who tried the case against Cannavo, Jonathan Marc Harrar ("ADA"), laid out his offer, explained the prior record score, and stated the guideline range for each crime. The ADA's email explained that "attempted murder—serious bodily injury caused," with the deadly weapon enhancement, had a guideline range of 201 months to the statutory limit; the aggravated assault crimes, with the deadly weapon enhancement, had guideline ranges of 90 to 108 months and 78 to 90 months; and felon not to possess had a range of 60 to 72 months. PCRA Hearing Exh. C-31. The email further stated that the victim suffered serious bodily injury and outlined the hospital procedures he underwent. *Id.*

The Friday before trial, Cannavo met with the ADA in the courthouse basement to negotiate a plea deal. N.T., Mar. 14, 2022, at 51. Trial counsel stated that at that time the ADA had offered eight to 16 years' incarceration. *Id.* Trial counsel had the ADA speak with Cannavo. Trial counsel did not recall the ADA "thr[owing] around any numbers about what he would ask for after trial in the event of a conviction." *Id.* at 53. Trial counsel testified he pointed out different weaknesses in the case and things he would argue at trial, in an attempt to get a better deal. *Id.* at 54. The Commonwealth offered a deal of

- 4 -

five to 10 years' incarceration, with no credit for time served. *Id.* at 55. Counsel testified that he met with Cannavo to try to convince him to take the five to 10 year deal, but he realized that Cannavo was not going to enter a plea, as Cannavo said he would not plead to any felonies. *Id.*

Cannavo admitted into evidence a transcription of a telephone call from the weekend before trial between himself, trial counsel, his parents, and a fifth person, during which Cannavo stated he would face 11 or 12 years if he went to trial:

> I was at three years, and I'm willing to say five to ten, boom, boom, boom. But I - - I don't want to plead guilty to something that didn't happen the way it happened. I'm - - I'm tired of them doing this to me. I'm tired of it. I was sleeping. If I have to do 11 to 12 years for standing up and fighting, that's what it is, man. That's what it is. I'm not a sucker. I don't have, quote-unquote, sucker written on my forehead. I'm tired of them arresting me for false pretenses. I'm sick of it. Done. I'm tired.

*Id.* at 62. Counsel agreed that during this conversation he did not tell Cannavo that he faced 20 to 40 or 30 to 60 years' incarceration if he went to trial, but testified that he had conversations with Cannavo before and after the phone call regarding his sentencing exposure. *Id.* at 64-66. He testified that the context of the telephone conversation was Mr. Cannavo's father "screaming at one point . . . . saying doesn't [his] son have a right to defend [him]self." *Id.* at 66.

Trial counsel further testified at the PCRA hearing that he would never "say that [the defendant would] win in front of the jury and the jury will find [the defendant] not guilty of a charge," and that he "use[s] the words triable

case." N.T., June 17, 2022, at 88. He stated that he told Cannavo that he had a "good argument in terms of attempted murder," but also told him that he was not sure if the defense would get the jury instruction they wanted, he was not sure what was going to happen, and Cannavo should take a plea. *Id.*

Trial counsel also discussed Cannavo's self-defense claim at trial. *Id.* at 5. He agreed that the victim and his friends were intoxicated and rowdy on the night of the shooting and that some testimony stated they had been fighting. *Id.* at 6-7. He acknowledged that one of the victim's friends told police officers that the victim would instigate fights when he was rowdy and drunk, and that at trial he did not ask the friend about this interview. *Id.* at 14-15.

He further testified that prior to trial he had learned of an interaction between the victim and the West Chester University police department approximately three and a half months after the shooting. *Id.* at 16. The police report reflected that officers responded to a report of screaming in a dorm room. *Id.* at 18. The report stated that when the officers approached the room, an officer rested his hand on his sidearm, and the victim yelled for the officer to take his hand off the gun and when the officer looked at him, he saw that the victim had tensed up and began to walk toward the open door. *Id.* at 19. The officer ordered the victim to stand against the wall, but the victim refused. *Id.* The officer grabbed the victim's arm to place him in handcuffs, but the victim tensed up and began to turn toward the officer, who again attempted to turn him around. *Id.* at 19-20. The victim continued to argue,

and the officer ordered him against the wall and threatened to tase him. *Id.* at 20. The officer was able to get the victim into handcuffs. *Id.*

Trial counsel testified that he considered the character evidence from the victim's friend that he instigated fights and whether it opened the door to character evidence about Cannavo. *Id.* at 33. He further testified that the witness was going to say that the victim was not rowdy on the night in question, and trial counsel did not have any cross-examination for her on the testimony. *Id.* at 42. Regarding the victim's encounter with the police, trial counsel noted that it was after the shooting and could be turned against Cannavo, as the victim had spent time in the hospital and his reaction to the police officer's gun could have been post-traumatic stress disorder. *Id.* at 43. Trial counsel also noted that the victim had not been charged with resisting arrest or disorderly conduct and that trial counsel spoke with the officer, who said the victim seemed scared. *Id.* at 44.

The ADA testified regarding the basement meeting with Cannavo, stating he remembered Cannavo was "on four years and kept essentially counter-offering or recommending that [the ADA] accept an offer to four years." N.T., Mar. 14, 2022, at 85-86. The ADA testified he had been in the seven to eight year range, and remembered they could not "really com[e] to terms on the charges," as the ADA wanted aggravated assault and Cannavo did not want to plead to that. *Id.* The ADA testified that he "vaguely recall[ed] trying to give [him]self leverage, essentially bluffing at the time because [he]

kn[e]w that the attempted murder charge was going to be very difficult[,]"[3] and suggesting Cannavo might get 20 years if convicted of attempted murder, and trial counsel "dismissing that that could happen." *Id.* at 87.

The ADA addressed Cannavo's claim that the ADA said he would seek a sentence of 12 to 24 years' imprisonment if Cannavo was found guilty at trial. He denied telling Cannavo the sentence he would request. *Id.* at 88. The ADA testified that "in a negotiated plea context . . . he absolutely" would not state the sentence the Commonwealth would seek if the defendant lost at a trial. N.T., Mar. 14, 2022, at 70-71. He explained that doing so would "undermine [his] leverage" in plea negotiations. *Id.* at 71. He pointed out that the purpose of plea negotiations is to come to an agreement and obviate the need for a trial, and it would "kind of cut [his] legs off" to say that even if the defendant went to trial, the ADA would cap a recommended sentence. *Id.* at 71-72. He stated it was possible that he discussed the standard and aggravated guideline sentences, which were 12 and 14 years. *Id.* at 93-94. The ADA acknowledged that he could not recount verbatim what happened at the meeting and might not remember important details. *Id.* at 97. He further stated that this was the only time he met with a defendant to negotiate a plea. *Id.*

_____

[3] The ADA testified that before trial, he thought the chances of getting a conviction for attempted murder were "slim." N.T., Mar. 14, 2022, at 73. However, he said that as the trial progressed, he realized the conviction was more likely, based on Cannavo's testimony and the testimony of the witnesses Cannavo presented. *Id.* at 103. Prior to and during trial, the ADA thought his case for aggravated assault with serious bodily injury was "[v]ery strong," because the *mens rea* for that crime was recklessness. *Id.* at 74.

Cannavo's mother, Jeanne Cannavo, testified that at some point after Cannavo was arrested, she learned that the victim had an encounter with the police. N.T., Aug. 3, 2022, at 18. When she found information on the arrest, she took pictures and called trial counsel. *Id.* at 19-20. She further testified that trial counsel told her about the Commonwealth's plea offer of five to 10 years' incarceration. *Id.* at 21. She testified that trial counsel had said that with a trial Cannavo faced 15 to 30 years' incarceration. *Id.* at 22. She stated she learned her son could face 25 to 50 years' incarceration right before sentencing. *Id.* at 25.

Cannavo also testified at the PCRA hearing. He said that he had not been informed that he could get more than 15 to 30 years' incarceration. *Id.* at 39. He testified that in October 2016, trial counsel said the Commonwealth had offered 10 to 20 years' in prison and counsel advised him not to take it. *Id.* at 40. He further testified that the Friday before trial, he and his trial counsel had a meeting with the Commonwealth, where Cannavo said he would accept a plea deal of four to eight years. *Id.* at 43. The ADA countered with eight to 16 and told Cannavo that if he lost at trial, the ADA "could get [the trial court] to give [him] a 12 to 24 year sentence" and that maybe he could "stretch and . . . get 14 to 28." *Id.* Cannavo said that in his opinion eight to 16 and 12 to 24 "isn't too far apart" and he declined the offer. *Id.* Cannavo testified that no one told him he could receive a sentence of up to 60 years. *Id.*

Cannavo testified that the day following the meeting with the ADA, his trial counsel came to the prison with a new offer from the Commonwealth of

five to 10 years' incarceration, without credit for time served. *Id.* at 44. The plea would be for aggravated assault and persons not to possess a firearm. *Id.* Cannavo testified that during a telephone call that weekend before trial, on which trial counsel was present, Cannavo stated that he would face 11 to 12 years if convicted, and counsel did not correct him. *Id.* at 47. He further testified regarding a call he made to his brother, where he said, "I would have done six-and-a-half and the DA said they were asking for 12 to 24 if I lose. So the way I see it, either way what the fuck does it matter? I am still fucked, right?" *Id.* at 51. He testified that it was his understanding that the Commonwealth would be asking for a sentence of 12 to 24 years after a trial. *Id.* at 52. He further testified that during a phone call he told a friend his counsel was trying to convince him to take the offer, but that "[i]f they don't give me what I want, I'm not taking it." *Id.* at 57. He told the friend that he had a conversation with the ADA where the ADA said he faced 12 to 24 years' incarceration for everything after a trial. *Id.* at 58. He testified to another call with the friend on the night before trial, where Cannavo said that he was "not taking the fucking crazy offer. They gave me five years and counting my time, I could live with it." *Id.* at 59.

Cannavo stated that from the beginning his trial counsel said he could not be convicted of attempted murder, and that his trial counsel also said this during the meeting with the ADA. *Id.* at 60. He said counsel said he could not see the trial court imposing a sentence in the double digits. *Id.* at 61. He stated that his counsel never told him he could face 20 to 40, 25 to 50, or 30

to 60 years' incarceration. *Id.* He said that if his counsel had advised him that he faced 20 to 40 years, he would have taken the deal. *Id.* at 61-62. He further testified that if his counsel had told him he could be convicted of attempted murder, he would have accepted the offer. *Id.* at 62. Cannavo agreed that his trial counsel advised him to accept the plea offer. *Id.* at 83.

On cross-examination, Cannavo admitted that in phone calls, he and his parents discussed that he could get 15 to 30 years' incarceration. *Id.* at 88. Further, he acknowledged that in a phone call he stated that his lawyers tried to convince him to take the deal, noting that co-counsel had charts outlining his sentencing exposure:

> [Co-counsel] had this whole diagram, like pie charts with how much time I could get. How much they are offering me in this scale. She had it all, all this shit. Like putting down on paper for her, like sitting there in front of me. She spent like an hour with me going over this.

*Id.* at 90-91.

The court denied the petition, and Cannavo timely appealed. After the parties filed their appellate briefs, in December 2023, new counsel entered his appearance for Cannavo. Counsel filed an application for permission to file a replacement or supplemental brief to raise three additional issues. This Court granted the application and allowed the parties to file new briefs.

Cannavo raises the following issues:

> I. Did the PCRA Court err, abuse its discretion, and make erroneous and unsupported findings of fact and conclusions of law in denying [Cannavo's] claims that:

a. Trial counsel was ineffective, the trial prosecutor broke a promise made during unsuccessful plea negotiations, and [Cannavo's] decision to reject a plea offer was not knowing, intelligent and voluntary?

b. Trial counsel ineffectively failed to seek admission of complainant . . . character for violence?

c. Trial counsel ineffectively failed to object to the serious bodily injury interrogatory associated with [Cannavo's] attempted murder charge and to [Cannavo's] illegal conviction and sentence for attempted murder, and appellate counsel ineffectively failed to raise the issue on appeal?

The following issues are raised for the first time on appeal pursuant to **Commonwealth v. Bradley**, 261 A.3d 381 (Pa. 2021):

II. Did PCRA counsel provide the ineffective assistance of counsel in failing to raise claims that:

a. Appellate counsel provided the ineffective assistance of counsel in failing to properly challenge the trial court's decision to deny [Cannavo] the castle doctrine instruction?

b. Appellate counsel ineffectively failed to properly raise a sufficiency challenge to [Cannavo's] conviction for attempted murder?

c. Trial counsel should have requested an attempted voluntary manslaughter instruction as a partial defense to attempted murder?

Cannavo's Br. at 4-5 (PCRA court answers omitted).

## I.    Claims Raised in PCRA Petition

Cannavo's first three issues challenge the denial of his PCRA petition. Our standard of review of an order denying PCRA relief is limited to determining "whether the PCRA court's determination is supported by

- 12 -

evidence of record and whether it is free of legal error." ***Commonwealth v. Hart***, 199 A.3d 475, 481 (Pa.Super. 2018) (citation omitted).

### a. Plea Negotiations

Cannavo claims he rejected the offer of 5 to 10 years' imprisonment, with no credit for time served, because he believed he faced a maximum sentence of 12 to 24 years' imprisonment, due to statements from his counsel and the ADA. He argues his counsel did not correct his misunderstanding. He maintains that his counsel was ineffective, the ADA's alleged broken promise violated his Due Process rights, and his rejection of the plea offer was not knowing, intelligent, and voluntary.

### Whether Counsel was Ineffective in Plea Negotiations

Cannavo maintains that his counsel did not advise him that he could receive 20 to 40, 25 to 50, or 30 to 60 years' incarceration if he lost at trial. He maintains his testimony as to this at the PCRA hearing was corroborated by his mother's testimony, the ADA's testimony, and the documentary evidence. He claims that the ADA testified that at a basement meeting three days before trial, trial counsel "dismissed outright" the possibility Cannavo could be sentenced to 20 years following trial. He maintains there is no reason to believe that trial counsel advised him differently outside of the meeting. He further notes that his mother testified that she only learned the court could sentence Cannavo to 25 to 50 years' imprisonment at the sentencing hearing. Cannavo points to recordings of prison calls where he expressed his misunderstanding of the sentencing exposure and said he believed he faced

no more than 15 to 30 years in prison. He highlights a call with counsel where counsel did not correct Cannavo when Cannavo stated he faced 11 to 12 years if he lost at trial. He further maintains that counsel "misadvised [Cannavo] that he could not be convicted of attempted murder." Cannavo's Br. at 30.

Cannavo maintains the PCRA court elevated his burden of proof by requiring direct evidence. He claims the legal errors "infected and compromised its credibility analysis, in which it . . . found trial counsel credible." *Id.* at 31. He maintains that if the court had applied the correct burden, it would have concluded he was not properly advised of his conviction or sentencing exposure. Cannavo argues that "[e]ven when directly confronted with [Cannavo's] extreme misapprehension of his exposure less than two days before trial began, counsel did nothing to rectify [Cannavo's] misunderstanding." *Id.* at 32.

Cannavo further maintains there was no reasonable basis not to advise him of the sentencing exposure, as that is necessary information. He claims this failure was "exacerbated and underscored by the incorrect advice that [Cannavo] would not and could not be convicted of attempted murder, which . . . carried a maximum of 20-to-40 years' incarceration." *Id.* at 34. He further maintains that he established prejudice because, if he had been accurately advised, he would have accepted the five-to-10 year deal, which entailed convictions and a sentence less severe than the judgment imposed.

To prevail on an ineffective assistance of counsel claim, the petitioner must establish: "(1) his underlying claim is of arguable merit; (2) counsel had

no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result." ***Commonwealth v. Spotz***, 84 A.3d 294, 311 (Pa. 2014). "[C]ounsel is presumed to be effective and the burden of demonstrating ineffectiveness rests on appellant." ***Commonwealth v. Ousley***, 21 A.3d 1238, 1244 (Pa.Super. 2011) (quoting ***Commonwealth v. Rivera***, 10 A.3d 1276, 1279 (Pa.Super. 2010)). "The failure to prove any one of the three [ineffectiveness] prongs results in the failure of petitioner's claim." ***Id.*** (quoting ***Rivera***, 10 A.3d at 1279). "To establish the third, prejudice prong, the petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's ineffectiveness." ***Commonwealth v. Chmiel***, 30 A.3d 1111, 1127-28 (Pa. 2011).

The PCRA court found counsel was not ineffective. It summarized the plea negotiation process and reviewed the evidence at length before rejecting the claim, largely on credibility grounds. It pointed out that counsel tried to convince Cannavo to accept the offer and noted trial counsel's testimony that defendant was fully advised of his conviction and sentencing exposure. The court explained that Cannavo bore the burden of proof and reasoned that the phone call where counsel did not correct Cannavo when discussing the maximum did not establish that conversations about the correct sentencing exposure never occurred.

The record supports the PCRA court's findings and its conclusions are free of legal error. The PCRA court did not hold Cannavo to a higher burden.

Rather, it acknowledged that counsel is presumed effective, and found trial counsel credible and Cannavo not credible. Following review of the certified record, the parties' briefs, the relevant law and the well-reasoned opinion of the Honorable David F. Bortner, we affirm on the basis of the trial court's opinion. *See* Trial Court Opinion, filed June 22, 2023, at 4-10 ("Tr.Ct.Op.").

### Whether Cannavo Was Denied Due Process During Plea Bargaining and Sentencing

Cannavo maintains that he proved that the ADA promised him that the Commonwealth's sentencing recommendation would be 12 to 24 years' incarceration following a guilty verdict. Cannavo maintains that the PCRA court's finding that no promise was made was clearly erroneous. He acknowledges that the ADA testified he did not make such a promise, but maintains the prison calls "tip the scales in favor of his version of the events." Cannavo's Br. at 37. He notes that the ADA admitted his recollection was not verbatim and he may have forgotten details. Cannavo contends that the record also established the promise induced him to forgo the plea deal. He claims that if the Commonwealth had said it would seek 25 to 50 years at sentencing, he would have accepted the offer for five to 10 years.

The PCRA court concluded that it was "nonsensical that a promise to sentence [Cannavo] to 12 to 24 years if convicted at trial would somehow induce him to reject a plea deal of five to ten years." Tr.Ct.Op. at 12. It credited the ADA's testimony that no such promise had been made and found that the evidence weighed against finding a promise. The court noted that

there is no reason the prosecution would promise a defendant a mitigated-range sentence if it won at trial, and that neither Cannavo nor his counsel mentioned any such promise at the sentencing hearing. *Id.* at 13. Following review of the record, the briefs, the relevant law, and the trial court opinion, we affirm on the basis of the trial court opinion. *Id.* at 11-13. The record supports the court's findings and it did not err in denying the claim.

### Whether Cannavo's Rejection of the Plea Deal was Knowing, Intelligent, and Voluntary

Cannavo maintains the record establishes that he rejected the plea deal because he misunderstood his sentencing exposure, believing it to be capped at 12-24 years. He maintains that regardless of the source of the misapprehension, he "did not make a knowing, intelligent, and voluntary waiver of his right to plead guilty or exercise his right to trial by jury, because his decision was not 'done with sufficient awareness of the relevant circumstances and likely consequences.'" Cannavo's Br. at 40. He maintains that any unwillingness he expressed in the prison phone calls to accept any deal "cannot be divorced from trial counsel's inaccurate advice and the Commonwealth's (broken) promise, on which [Cannavo's] decision to go to trial hinged." *Id.* at 41.

The PCRA court found that Cannavo's statements on the phone calls that he "desire[d] to reject any plea and go to trial," belie his claim that he did not voluntarily reject the plea offer. Tr.Ct.Op. at 14. The court found that he "cannot now accuse the very persons who were trying to get him to accept a

- 17 -

plea of somehow depriving him of his right to make that decision – particularly when that advice was rejected." *Id.* Following review of the record, the briefs, the relevant law, and the trial court opinion, we affirm on the basis of the trial court opinion. Tr.Ct.Op. at 10-14.

### b. Whether Counsel Was Ineffective for Not Admitting Testimony Regarding The Victim's Character

Cannavo next argues that his trial counsel was ineffective for failing to present the testimony of a police officer and civilian witness to demonstrate the victim had a violent character when intoxicated.

Generally, evidence of a person's character "is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Pa.R.Evid 404(a)(1). However, in a criminal case, "a defendant may offer evidence of an alleged victim's pertinent trait," and, if admitted, the prosecutor may offer evidence to rebut it or "offer evidence of the defendant's same trait." Pa.R.Evid. 404(a)(2)(B). Where a defendant asserts self-defense at trial, he or she "may introduce evidence of the turbulent or dangerous character of the decedent." *Commonwealth v. Carbone*, 707 A.2d 1145, 1154 (Pa.Super. 1998). Such evidence is admissible "1) to corroborate the defendant's alleged knowledge of the victim's violent character in an effort to show that the defendant reasonably believed that her life was in danger; and/or 2) to prove the allegedly violent propensities of the victim to show that the victim was in fact the aggressor." *Id.* (emphasis removed).

The PCRA court found that the testimony at issue did not support a conclusion that the victim had a violent character. The court explained that the testimony from the victim's friend did not state that the victim was rowdy on the night of the incident, and did not elaborate on whether his capacity to get drunk and rowdy was a frequent occurrence. It further found that there was no basis to conclude the victim's interaction with the police was a violent encounter, noting the victim was cited only for underage drinking. Because the evidence did not demonstrate the victim had a character for violence, the court concluded counsel could not be ineffective for failing to admit it at trial. After review of the record, the briefs, the relevant law, and the trial court opinion, we affirm on the basis of the trial court opinion. Tr.Ct.Op. at 15-17.

### c. Whether Counsel Was Ineffective for Not Objecting to the Serious Bodily Injury Special Interrogatory

Cannavo maintains that his trial and appellate counsel were ineffective for failing to recognize and act upon the jury's failure to find an essential element of an enhanced sentence for attempted murder – serious bodily injury – beyond a reasonable doubt. He claims the jury did not find the element beyond a reasonable doubt because it allegedly had not been instructed that serious bodily injury was an element of attempted murder. He further notes the Commonwealth did not charge him with attempted murder resulting in serious bodily injury and alleged he had not been put on notice that the Commonwealth would seek to prove serious bodily injury.

"[W]hen the Commonwealth intends to seek an enhanced sentence for attempted murder resulting in serious bodily injury under Section 1102(c), the Commonwealth must include a citation to the statutory provision as well as its language in the charging documents." *Commonwealth v. King*, 234 A.3d 549, 562 (Pa. 2020). In *King*, the criminal information charged the defendant with attempted murder but did not reference 18 Pa.C.S.A. § 1102(c), which provides that the maximum sentence for attempted murder is 40 years where serious bodily injury occurs, rather than the 20-year maximum where no serious bodily injury results. 234 A.2d at 553. There, during plea negotiations, the Commonwealth informed the defendant that the recommended minimum sentence for attempted murder was the sentence applicable where serious bodily injury occurred. At trial, the defendant stipulated that the victim suffered a shattered hipbone and anklebone, which required multiple surgeries and high intensity inpatient occupational and physical therapy. *Id.* The verdict sheet in *King* told the jury that if it found the defendant guilty of attempted murder, to determine whether it found "beyond a reasonable doubt that the victim suffered serious bodily injury[.]" *Id.* The jury found the defendant guilty of attempted murder and found the victim suffered serious bodily injury. *Id.*

The Pennsylvania Supreme Court in *King* concluded the indictment and criminal information "were facially inadequate because neither document alerted [the defendant] to the Commonwealth's intention to prove serious bodily injury with respect to the attempted murder count." *Id.* at 561.

- 20 -

However, it held that, where the element of serious bodily injury in connection with attempted murder was submitted to the jury and found beyond a reasonable doubt, a sentence based on the enhanced penalty was not necessarily illegal. *Id.* at 563. The court applied the harmless error doctrine and found the failure to include notice of the enhancement in the charging documents was harmless. *Id.* at 566. The Court noted that in *King* the evidence of serious bodily injury was "overwhelming and uncontroverted," the jury found serious bodily injury beyond a reasonable doubt, and the defendant did not contest the severity of the injuries. *Id.* The Court added that the defendant had received *de facto* notice of the intent to seek the enhancement due to the factual summaries in the charging documents, plea discussions where the guideline range for attempted murder was based on the enhancement, and defense counsel's agreement to the verdict sheet, including the special interrogatory. *Id.* The Court emphasized that the failure to provide formal notice did not affect the defendant's choice or execution of his defense. *Id.* The Court therefore concluded that "the harmless nature of the error preclude[d] a finding that the sentence was illegally imposed." *Id.*

The PCRA court agreed with Cannavo that the Commonwealth did not cite Section 1102(c) in the information and did not give formal notice of the use of the section. Tr.Ct.Op. at 29. However, it found that the evidence of serious bodily injury in the case was overwhelming. The court emphasized that Cannavo did not contest the severity of the injury, noting the defense was grounded in self-defense. *Id.* at 32. The court further pointed out that

the jury, not the court, found the presence of serious bodily injury, and that the court told the jury at least eight times in the instructions that it had to reach a verdict beyond a reasonable doubt. *Id.* The court concluded that Cannavo had *de facto* notice the Commonwealth was seeking the enhancement, noting the testimony about the injury at the preliminary hearing and an email from the ADA outlining the guideline range for attempted murder with the enhancement. *Id.* at 33. The court noted the similarities to *King* and concluded that counsel was not ineffective for failing to object to the serious bodily injury interrogatory. *Id.* at 35. If found the cases relied on by Cannavo—*Commonwealth v. Johnson*, 910 A.2d 60 (Pa.Super. 2006) (*en banc*), *Commonwealth v. Barnes*, 167 A.3d 110 (Pa.Super. 2017) (*en banc*), and *Commonwealth v. Bickerstaff*, 204 A.3d 988 (Pa.Super. 2019)—distinguishable.

Following review of the record, briefs, relevant law, and trial court opinion, we affirm on the basis of the trial court opinion. *See id.* at 29-36. The record supports the court's findings and it did not err in concluding counsel was not ineffective.

## II.    Claims of PCRA Counsel's Ineffectiveness

On appeal, Cannavo also raises three claims that PCRA counsel was ineffective. To obtain relief on a claim that PCRA counsel was ineffective for not raising a claim that prior counsel was ineffective, the petitioner "must meet all three prongs of the . . . test for ineffectiveness" for each layer of counsel. *Chmiel*, 30 A.3d at 1128 (citation omitted). If a petitioner asserting

a layered ineffectiveness claim fails to satisfy any of the three prongs of the ineffectiveness test for any layer of counsel, the entire layered claim fails. *Id.* (citation omitted).[4]

Cannavo maintains that his PCRA counsel was ineffective for "failing to challenge appellate counsel's performance in raising a claim relating to the trial court's decision to deny [Cannavo] a castle doctrine instruction." Cannavo's Br. at 22. He points out that trial counsel requested the castle doctrine instruction, but the trial court denied the request, allegedly because it found Cannavo was not credible. Cannavo notes that on appeal this Court found the claim waived because appellate counsel failed to cite evidence to support the argument and even if it had not been waived, the claim substantively failed because Cannavo unlawfully possessed the firearm.

_____

[4] PCRA petitioners can raise PCRA counsel ineffectiveness claims "at the first opportunity when represented by new counsel, even if on appeal[.]" **Commonwealth v. Bradley**, 261 A.3d 381, 401 (Pa. 2021). In **Bradley**, the Pennsylvania Supreme Court noted that "[i]n some instances, the record before the appellate court will be sufficient to allow for disposition of any newly-raised ineffectiveness claims." *Id.* at 402. "[I]in other cases, the appellate court may need to remand to the PCRA court for further development of the record and for the PCRA court to consider such claims as an initial matter." *Id.* It stated that where there are "material facts at issue concerning [claims challenging counsel's stewardship] and relief is not plainly unavailable as a matter of law, the remand should be afforded." *Id.* (citation omitted).

Here, Cannavo states that a remand for a PCRA hearing is not necessary for the appellate counsel ineffectiveness claim for failing to adequately challenge the denial of the castle doctrine instruction. Cannavo's Br. at 76. We agree. We further conclude that remand is not necessary for his claim that PCRA counsel failed to properly argue on direct appeal that the evidence was insufficient to support the verdict.

Cannavo contends appellate counsel should have cited the ample evidence that, according to Cannavo, would have warranted the instruction and argued that the possession of the firearm was justified.

The castle doctrine provides that a person is presumed to have a reasonable belief that deadly force is necessary for self-protection against enumerated conduct if the target of the deadly force – "the person against whom force is used" – is in the process of unlawfully and forcefully entering a dwelling or residence and the actor knows or has reason to know that the unlawful entry is occurring:

> (2.1) Except as otherwise provided in paragraph (2.2), an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat if both of the following conditions exist:
>
> > (i) The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle; or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling, residence or occupied vehicle.
>
> > (ii) The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

18 Pa.C.S.A. § 505(b)(2.1). However, the presumption does not apply if person using deadly force "is engaged in a criminal activity or is using the dwelling, residence or occupied vehicle to further a criminal activity." 18 Pa.C.S.A. § 505(b)(2.2)(iii). A claim of either self-defense or the castle

- 24 -

doctrine may be based on evidence from whatever source, and whether either doctrine applies is a question of law for the court. **Cannavo**, 199 A.3d at 1287 (citing **Commonwealth v. Mayfield**, 585 A.2d 1069, 1070 (Pa.Super. 1991) (*en banc*)).

Here, Cannavo's counsel on direct appeal challenged the refusal to give a castle doctrine instruction. This Court concluded the "trial court acted properly in considering the propriety of a castle-doctrine instruction to be a question of law subject to the court's review of the evidence presented." **Id.** at 1289. We concluded one argument raised in support of the issue – that the evidence demonstrated that the victim was unlawfully attempting to enter the residence – was waived for failure to cite support for it in the brief. **Id.** However, we found that Cannavo was not entitled to the castle doctrine instruction because Cannavo unlawfully possessed the firearm he used to shoot the victim and therefore "'engaged in criminal activity' as contemplated by Section 505(b)(2.2)(iii)." **Id.** We agreed with the trial court "that by picking up the firearm while not in imminent danger from the victim, [Cannavo's] action was not justifiable under Chapter 5 of the Crimes Code." **Id.** at 1290. We further concluded that Cannavo's "discharge of the illegal firearm was clearly related to his confrontation with the victim, as it was the weapon he used in coming into contact with the victim." **Id.** We therefore concluded that Cannavo was precluded from asserting a castle doctrine defense by Section 505(b)(2.2)(iii).

Here, appellate counsel raised on direct appeal the trial court's failure to issue a castle doctrine instruction. We concluded that the castle doctrine was not applicable because Cannavo was engaged in criminal activity. No additional argument on whether the victim unlawfully attempted to enter the residence would have altered the outcome of the appeal, and Cannavo has presented no argument in this PCRA appeal that would have altered the conclusion that he was not entitled to the castle doctrine due to his criminal activity. Therefore, Cannavo cannot establish prejudice, and his PCRA counsel ineffectiveness claim fails.

Cannavo next argues that PCRA counsel should have alleged appellate counsel was ineffective for failing to properly challenge the sufficiency of the evidence for the attempted murder conviction. He maintains that appellate counsel raised a waived jury instruction claim rather than a sufficiency of the evidence claim. He argues the evidence did not support a finding he had the specific intent to kill.

In this Court's opinion on direct appeal, we addressed whether the evidence was sufficient to support attempted murder, and found it sufficient:

> [Cannavo's] final argument is that the evidence was insufficient to support his conviction for attempted murder. [Cannavo] posits that the trial court failed to proffer an instruction on malice, resulting in the jury's failure to find the element of malice existed. He claims that, in the self-defense context, an actual but unreasonable belief in the need to use deadly force negates malice. We disagree.
>
> Our well-settled standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict-winner, in

this case, the Commonwealth, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. ***Commonwealth v. Dale***, 836 A.2d 150, 152 (Pa.Super. 2003). "[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." ***Commonwealth v. Bruce***, 207 Pa.Super. 4, 916 A.2d 657, 661 (2007) (citation omitted). Any doubt raised as to the accused's guilt is to be resolved by the fact-finder. ***Commonwealth v. Kinney***, 863 A.2d 581, 584 (Pa.Super. 2004). We will not disturb the verdict "unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." ***Bruce***, 916 A.2d at 661 (citation omitted). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." ***Commonwealth v. Gibbs***, 981 A.2d 274, 281 (Pa.Super. 2009) (citations omitted).

Initially, it appears that although [Cannavo] couches his argument in terms of sufficiency of the evidence, he is actually arguing that the trial court erred in not giving the Suggested Standard Criminal Jury Instruction on malice. ***See*** Appellant's Brief, at 43-44 (quoting Pennsylvania Suggested Standard Jury Instruction (Crim.) 15.2503(1), (2)). Any challenge by [Cannavo] to the adequacy of the jury instructions regarding malice, however, is waived, as [Cannavo] did not file an objection to the court's alleged failure to include the instruction.

. . .

Perhaps recognizing that he had not filed an objection, [Cannavo] attempts to phrase his sufficiency argument in such a way that he can argue the jury never considered the element of malice, thus making the evidence insufficient to sustain his conviction for attempted murder. [Cannavo] ignores, however, the standard of review for sufficiency claims, which is to review the actual evidence presented at trial and all reasonable inferences therefrom, and then to determine if they are "sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt." ***Dale***, 836 A.2d at 152.

Simply stated, our review of sufficiency claims is not what instructions the jury followed to reach its verdict, but instead to evaluate the evidence the jury had before it. [Cannavo] cites no case law in support of his altered standard of review. Accordingly, any argument [Cannavo] makes in regard to the adequacy of the jury instructions regarding malice is waived, and we proceed to examine whether the evidence was sufficient to support his conviction of attempted murder.

"A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.[A.] § 901(a). "The substantial step test broadens the scope of attempt liability by concentrating on the acts the defendant has done and does not any longer focus on the acts remaining to be done before the actual commission of the crime." *In re R.D.*, 44 A.3d 657, 678 (Pa.Super. 2012).

[Cannavo] was charged with attempted murder of the first degree; first-degree murder is defined as follows: "A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.[A.] § 2502(a). An intentional killing is defined as: "Killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S.[A.] § 2502(d). "[T]he period of reflection required for premeditation to establish the specific intent to kill may be very brief; in fact, the design to kill can be formulated in a fraction of a second." *Commonwealth v. Rivera*, 603 Pa. 340, 355, 983 A.2d 1211, 1220 (2009) (quoting *Commonwealth v. Drumheller*, 570 Pa. 117, 808 A.2d 893, 910 (2002)).

"The mens rea required for first-degree murder, specific intent to kill, may be established solely from the circumstantial evidence. The law permits the fact finder to infer that one intends the natural and probable consequences of his acts." *Commonwealth v. Jackson*, 955 A.2d 441, 444 (Pa.Super. 2008). "The manner by which a killing is accomplished can provide an inference of specific intent to kill: i.e., the use of a deadly weapon upon a vital part of the victim's body allows such an inference."

*Commonwealth v. Bennett*, 618 Pa. 553, 581, 57 A.3d 1185, 1202 (2012).

We have no hesitation in finding the evidence sufficient to support the elements of attempted murder of the first degree. By firing his weapon toward a group of people, he took a substantial step toward the commission of the crime. *See* 18 Pa.C.S.[A.] § 901(a). Although [Cannavo] fired through a door and did not see the victim as he was firing, he fired the gun toward where he perceived the group of people to have been standing and at an abdominal-area height, which ended up striking the victim in the small intestine. [Cannavo] therefore fired the bullet toward a vital part of the victim's body, which was sufficient for the jury to infer a specific intent to kill. *See Bennett*, supra.

To the extent [Cannavo] may argue evidence of malice was necessary to convict for attempted murder, [Cannavo] acknowledges that this Court has consistently held malice is not an element of attempted murder. *See, e.g., Commonwealth v. Geathers*, 847 A.2d 730, 736 (Pa.Super. 2004) ("[M]alice is not an element of attempted murder."). It is well-settled that we are bound by prior decisions of this Court. *See Commonwealth v. Coppedge*, 984 A.2d 562, 565 (Pa.Super. 2009) (quoting *Commonwealth v. Baker*, 963 A.2d at 509). Even if we were to consider the sufficiency of the evidence to support malice, "[s]pecific intent and malice may be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body." *Commonwealth v. Arrington*, 624 Pa. 506, 522, 86 A.3d 831, 840 (2014) (citing *Commonwealth v. Houser*, 610 Pa. 264, 273, 18 A.3d 1128 1128, 1133-34 (2011)). As we have found *supra*, [Cannavo's] firing his weapon toward the abdominal area of the group of people is sufficient to show that he used a deadly weapon toward a vital part of the body. [Cannavo's] argument fails, and the evidence was sufficient to support his conviction for attempted murder.

*Cannavo*, 199 A.3d at 1290-92 (footnote omitted).

Accordingly, we have already found the evidence sufficient to prove attempted murder. Cannavo therefore cannot establish that the underlying

claim has arguable merit. Further, he cannot show prejudice. Because we addressed the sufficiency claim, Cannavo cannot establish that, had counsel raised the claim directly, rather than as a challenge to the jury instructions, the outcome of the appeal would have been different. This claim fails.

In his last claim, Cannavo argues that PCRA counsel should have claimed trial counsel was ineffective for failing to request an instruction on attempted voluntary manslaughter. He maintains voluntary manslaughter is a defense to attempted murder and applies where the defendant attempted to kill another but unreasonably believed he needed to do so. He maintains a jury may have believed Cannavo did not have the right to defend himself with deadly force but that the Commonwealth did not disprove that he believed he had to do so.

A person is guilty of voluntary manslaughter if he "knowingly and intentionally kills an individual" under the unreasonable belief that the killing was justified. 18 Pa.C.S.A. § 2503 (b).[5] To "procure a conviction for voluntary manslaughter the Commonwealth must prove, beyond a reasonable doubt, that the homicide was not justified." ***Commonwealth v. Weston***, 749 A.2d 458, 462 (Pa. 2000). "Voluntary manslaughter, imperfect self-defense, requires that the Commonwealth establish that the defendant 'intentionally and knowingly' killed another." ***Id.*** (quoting 18 Pa.C.S.A. § 2503(b)).

---

[5] A person can also be found guilty of voluntary manslaughter if he acted under a sudden and intense passion resulting from a serious provocation. 18 Pa.C.S.A. § 2503(a). This type of voluntary manslaughter is not at issue.

"[I]mperfect belief self-defense 'is imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life.'" ***Commonwealth v. Sepulveda***, 55 A.3d 1108, 1124 (Pa. 2012). "All other principles of justification under 18 Pa.C.S.[A.] § 505 must [be satisfied to prove] unreasonable belief voluntary manslaughter.'" ***Id.*** (brackets in original). "[A]n imperfect self-defense voluntary manslaughter theory has two components: the defendant's subjectively-held belief of danger posed by the victim, as to which expert testimony was admissible, and the objective measurement of that belief, *i.e.*, the reasonableness of that held belief[.]" ***Id.*** at 1125. "[A] viable claim of imperfect self-defense voluntary manslaughter cannot be based solely on the subjective state of mind of the defendant." ***Id.*** at 1126.

We remand this claim to the PCRA court to hold a hearing to determine whether PCRA counsel was ineffective for failing to challenge trial counsel's failure to request a voluntary manslaughter instruction. The record before this court is insufficient to make this determination in the first instance. We therefore must remand "for further development of the record and for the PCRA court to consider such claims as an initial matter." ***Bradley***, 261 A.3d at 402. PCRA counsel and trial counsel must be given an opportunity to respond to the allegations, and the PCRA court must make credibility determinations regarding this issue.

Order vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/2/2024

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

: CHESTER COUNTY, PENNSYLVANIA

v. :

: CRIMINAL ACTION – PCRA

JAMES MAURICE CANNAVO, JR. : CR-4483-15

Leslie Pike, Esquire, Assistant District Attorney for the Commonwealth
Jonathan Cioschi, Esquire, Counsel for Defendant

## OPINION

On March 24, 2017, Defendant was convicted by a jury of one count of Attempted Murder, 18 Pa.C.S. §§901 and 2502(a); two counts of Aggravated Assault, 18 Pa.C.S. §§2702(a)(1) and (a)(4); one count of Recklessly Endangering Another Person, 18 Pa.C.S. §2705; and two counts of Simple Assault, 18 Pa.C.S. §§2701(a)(1) and (a)(2). The jury also found that the victim suffered serious bodily injury during the attempted murder, invoking the sentencing enhancement set forth in 18 Pa.C.S. §1102(c). Based upon another interrogatory answered by the jury, the court found Defendant guilty of Persons Not to Possess Firearms, 18 Pa.C.S. §6105(a)(1), on April 19, 2017. On June 22, 2017, the court sentenced Defendant to an aggregate term of imprisonment of not less than twenty-five (25) nor more than fifty (50) years. A post-sentence motion pursuant to Pa.R.Crim.P. 720(B)(1)(a) was filed on June 30, 2017, and was denied by the court on October 24, 2017. The Superior Court affirmed Defendant's conviction on December 3, 2018, and his petition for allowance of appeal to the Pennsylvania Supreme Court was denied on August 5, 2019.

1

Defendant filed the instant PCRA petition on October 20, 2020. In the petition, counsel requested to file a brief in support of the petition, and on October 23, 2020 the court ordered such a brief to be filed. Defendant's memorandum of law, as well a motion to amend the petition based upon the content of the memorandum, was thereafter filed on December 4, 2020. On December 9, 2020, court granted Defendant's motion to amend and ordered the Commonwealth to file a response to the petition. The Commonwealth's response was filed on February 21, 2021, and Defendant filed his own reply to the Commonwealth's response on April 12, 2021. A hearing on the petition was thereafter conducted on March 14, June 17, and August 3, 2022. On November 28, 2022, Defendant filed a brief in support of the petition as well as a "Motion to Conform Pleadings to the Evidence Developed at the Petitioner's PCRA Evidentiary Hearing." The Commonwealth's brief in opposition to the petition was thereafter filed on January 27, 2023.

Defendant's first claim is phrased in the following manner in his initial petition:

> Trial counsel ineffectively advised Petitioner that he would not be convicted of attempted murder and would not receive a sentence in the "double digits" if convicted; and ineffectively failed to advise Petitioner of his maximum sentencing exposure, thus causing Petitioner to reject a negotiated guilty plea involving a five-to-ten-year sentence of imprisonment.

However, in Defendant's post-hearing brief, the claim is set forth as follows:

> Petitioner Was Denied Effective Assistance of Counsel in Plea Negotiations, Because His Trial Counsel Failed to Give Him Proper, Critical Advice Concerning, Among Other Things, His Sentencing Exposure Should He Be Convicted at Trial, Which Caused Petitioner to Reject Favorable Plea Deals, Including a Negotiated

2

Guilty Plea of Five-to-Ten Years' Imprisonment with No Credit for Time Served[.]

Technically, the claim properly before the court is the one raised in the petition itself. However, these two claims, while phrased differently, are fundamentally raising the same issue – that trial counsel's ineffective advice in presenting plea deals caused Defendant erroneously, unknowingly, or improperly to reject a favorable plea deal.

Pursuant to 42 Pa.C.S. §9543(a)(2)(ii), an individual serving a sentence may challenge their conviction based upon "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." In *Commonwealth v. Spotz*, 84 A.3d 294 (Pa. 2014), the Pennsylvania Supreme Court outlined the long-established standard to prove ineffective assistance of counsel:

> [A] PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. Counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him. In Pennsylvania, we have refined the [*Strickland v. Washington*, 466 U.S. 668 (1984)] performance and prejudice test into a three-part inquiry. Thus, to prove counsel ineffective, the petitioner must show that: (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result. If a petitioner fails to prove any of these prongs, his claim fails. Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's

3

interests. Where matters of strategy and tactics are concerned, a finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued. To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.

*Id.* at 311-12 (citations and quotation marks omitted).

When a defendant asserts that ineffective assistance of counsel causes the rejection of a plea offer, the defendant must demonstrate that, absent that ineffective assistance, "there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Commonwealth v. Steckley*, 128 A.3d 826, 831 (Pa. Super. 2015), *quoting Lafler v. Cooper*, 566 U.S. 156, 164 (2012).

The first plea offer in this case was conveyed on October 21, 2016 by Jonathan Harrar, Esquire, the assigned assistant district attorney, to Evan Kelly, Esquire, lead counsel for Defendant. In an email to Mr. Kelly, admitted as Commonwealth's Exhibit C-31 at the hearing, Mr. Harrar offered Defendant an aggregate sentence of ten (10) to twenty (20) years on Aggravated Assault and Persons Not to Possess Firearms. After outlining Defendant's prior record score and the guideline ranges for these crimes, Mr. Harrar speculated that

4

Defendant could receive 12 to 24 or even 14 to 28 years of incarceration if convicted of those offenses at trial. Mr. Harrar testified at the March 14, 2022 proceeding that he only referenced these crimes as he was confident of a conviction of those crimes, but not of a conviction on the attempted murder charge, if the case did proceed to trial. The consequences of a conviction for attempted murder were not raised in this email. Both Mr. Kelly and Mr. Harrar testified that they understood that these speculative potential sentences did not constitute an explicit promise that the Commonwealth would in fact seek one of those exact sentences if Defendant was convicted.

Without consulting Defendant, Mr. Kelly rejected this plea offer, confident in his belief that the offer was only the first step in plea negotiations. He testified that he was confident he could force the Commonwealth to give a lower offer through the filing of pretrial motions and other negotiating tactics. Mr. Kelly subsequently informed Defendant of the offer and that he did not recommend taking it, and Defendant never indicated that he was ever interested in that offer.

On January 5, 2017, Mr. Harrar sent another email to Mr. Kelly, in which he indicated that he was intending to introduce certain of Defendant's prison phone calls at trial. According to Mr. Kelly, the content of these calls completely changed his outlook on a potential trial. He testified that the "callousness" displayed by Defendant in these calls would prejudice the jury against him. Indeed, Mr. Kelly even indicated that the calls were so damaging that he had serious concerns about the potential for success at trial.

5

Additional phone calls between Defendant and his family, particularly the call admitted as Commonwealth's Exhibit C-14, indicated Defendant's displeasure with this new outlook by Mr. Kelly on the possible outcome of a trial. Mr. Kelly then focused his efforts on attempting to negotiate a plea deal, and attempted at least five times to convince Defendant to plead guilty.

As trial approached, Mr. Harrar lowered his offer to eight (8) to sixteen (16) years of incarceration. Even with this lower offer, Defendant was still unwilling to plead guilty, so Mr. Kelly suggested that Mr. Harrar meet directly with Defendant in an effort to forge a deal that was acceptable to all sides. The week prior to trial, Mr. Harrar met face-to-face with Defendant in the presence of Mr. Kelly in the Sheriff's Office in the basement of the Chester County Justice Center. According to Mr. Harrar, this was the only time in his career he ever negotiated directly with a defendant in this manner. This meeting was ultimately fruitless, as Defendant was only interested in serving a minimum of four (4) years, and Mr. Harrar would not go lower than seven (7) years. Mr. Harrar told Defendant that he could be convicted of attempted murder and serve twenty years in prison.

However, Mr. Kelly at the time did not believe that the Commonwealth necessarily had a strong case for attempted murder. Mr. Kelly had previously informed Defendant that he had a strong defense case on attempted murder. Defendant himself later testified that Mr. Kelly, in no uncertain terms, told him that he "would not" be convicted of that crime. Defendant also claims that, in this eleventh-hour meeting, Mr. Harrar specifically indicated that he would

6

only seek a sentence of twelve (12) to twenty-four (24) years if Defendant was convicted at trial. Mr. Harrar testified that he did not make such a promise, nor would he have done so in any case as it would effectively neutralize any bargaining power that he had as the prosecutor.

During the weekend prior to trial, Mr. Kelly was still working to negotiate a plea acceptable to Defendant. Mr. Harrar's final plea offer was five (5) to ten (10) years of incarceration with a waiver of credit for time served. Mr. Kelly met with Defendant and advised him to take this plea offer, but Defendant again refused. Phone calls between Defendant, Mr. Kelly, and his family recorded in the days prior to trial (Commonwealth's Exhibit C-14 and Petitioner's Exhibit P-4) accurately illustrate Mr. Kelly's vain attempts to convince Defendant to take the five to ten years offer – even after Mr. Harrar offered to give Defendant half of his credit for time served. Indeed, Defendant's own attitude towards a plea also became more recalcitrant on the eve of trial. He was adamant that he had engaged in an act of self-defense and indicated that he would only plead to misdemeanors, which effectively curtailed any plea offer. The case went to trial, and Defendant was convicted of all charges, including attempted murder.

Defendant alleges that, in this plea negotiation process, counsel failed to fully advise him of the maximum sentence exposure of a conviction at trial. According to Defendant, that failure by counsel caused him to reject plea offers that, if he had been fully cognizant of the possible sentence he could receive if convicted, he would have accepted. As set forth above, counsel is presumed effective, therefore the burden is on Defendant to establish that Mr. Kelly did

7

not adequately explain the possible sentence that could result from a trial. We first note that Defendant's argument that he would have taken a plea deal if not for counsel's failure to fully advise him, when counsel's advice in the first instance *was to take a deal*, is somewhat self-contradictory.

Defendant argues that the evidence presented at the hearing, particularly the prison phone calls between Defendant, his family, and Mr. Kelly, prove that Mr. Kelly failed to fully advise Defendant of his conviction and sentencing exposures. We agree that the recordings do not contain any explicit statements by Mr. Kelly on Defendant's full exposure if he were convicted at trial. However, the absence of that explanation does not, in and of itself, mean that such an explanation was not ever given. These recordings did not constitute the entirety of the attorney-client relationship between Mr. Kelly and Defendant.

We are also not persuaded by Defendant's argument that the advice was not given because Mr. Kelly did not make note of it somewhere in his work product. Mr. Kelly was under no obligation to make a record of each and every item that he discussed with Defendant. Because no direct evidence in the admitted exhibits exists that Mr. Kelly gave this advice, Defendant is asking the court to presume that it was not given. However, as set forth above, counsel is *presumed effective.* In a situation where the record is silent on whether counsel was ineffective in a certain situation, we are required to presume that counsel acted in a proper manner.

As the evidentiary record does not prove any ineffectiveness, the core determination ultimately becomes one of credibility. Mr. Kelly testified that Defendant was fully advised of his conviction and sentencing exposure, either by himself or co-counsel. Defendant and his mother, Jeanne Cannavo, testified that Mr. Kelly said that Defendant would not, under any circumstances, be convicted of attempted murder and could never receive more than fifteen to thirty years of incarceration if convicted. In order to overcome the presumption of effectiveness, the court would necessarily have to find Mr. Kelly's testimony incredible, virtually in its entirety. There is no evidence whatsoever in this record, from exhibits or testimony, that provides any basis upon which to completely negate Mr. Kelly's credibility.

However, as the court always instructs a jury in a criminal case, one aspect of weighing a defendant's credibility is the fact that he or she has a "vital interest" in the outcome of the case. In this case, Defendant is facing a very lengthy term of incarceration – reducing or even eliminating that sentence certainly constitutes something of "vital interest" to him. The self-serving testimony of Defendant and his family does not overcome the presumption that counsel was effective, particularly when there is no concrete or explicit evidentiary basis upon which to conclude that Mr. Kelly was fabricating his testimony.

The court concludes that the reason Defendant did not take a plea deal was not a result of counsel's failure to properly advise him, but rather Defendant's unwillingness to follow the advice of his counsel. In effect,

9

Defendant is now blaming counsel for Defendant's own failure to act as counsel proposed. Based upon the record as developed at the hearing, we cannot conclude that Mr. Kelly failed to fully advise Defendant of his exposure prior to trial. Accordingly, this claim of Defendant's PCRA petition is denied.

Defendant's next two issues were not raised in the initial petition or its amendments, but rather in the post-hearing brief and a concomitant filing entitled "Motion to Conform Pleadings to the Evidence Developed at the Petitioner's PCRA Evidentiary Hearing." In this motion, Defendant seeks to amend his petition to add two sub-claims to his first PCRA claim, arguing that those claims are now proper based upon Defendant's interpretation of the evidence presented at the hearing.

The Commonwealth argues that this amendment is not timely and should be rejected. However, the plain language of Pa.R.Crim.P. 905, entitled "Amendment and Withdrawal of Petition for Post-Conviction Collateral Relief," states that "[t]he judge may grant leave to amend or withdraw a petition for post-conviction collateral relief at *any time*. Amendment shall be freely allowed to achieve substantial justice." Pa.R.Crim.P. 905(A) (emphasis added). Based upon this rule, we see no reason to prohibit this amendment and the court is granting Defendant's motion to include these claims in the petition. We will therefore address these issues herein.

The first of the two new sub-claims states:

> In Violation of Petitioner's Due Process Rights under the Fourteenth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution, the Commonwealth Induced Petitioner to Reject the Above-Cited Plea

10

Deal by Promising to Seek a 12-to-24-Year Prison Sentence if Petitioner Was Convicted after Trial, Only to Renege on That Promise Following Trial and Seek a 25-to-50-Year Prison Sentence, Which This Court Imposed.

This claim does not rest on ineffective assistance of counsel, but rather appears to assert a separate basis for relief under the PCRA, that "[a] violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. §9543(a)(2)(i). A due process claim regarding the duration of Defendant's sentence is not in any way related to the "adjudication of guilt or innocence," so it is unclear whether this issue is actually cognizable under the PCRA. Nevertheless, we will analyze this claim on its merits.

The Commonwealth is generally required to hold to any unequivocal promises made during the plea negotiation process. As recently set forth by the Pennsylvania Supreme Court in *Commonwealth v. Cosby*, 252 A.3d 1092 (Pa. 2021):

> [Precedents in case law] obligate courts to hold prosecutors to their word, to enforce promises, to ensure that defendants' decisions are made with a full understanding of the circumstances, and to prevent fraudulent inducements of waivers of one or more constitutional rights. Prosecutors can be bound by their assurances or decisions under principles of contract law or by application of the fundamental fairness considerations that inform and undergird the due process of law. The law is clear that, based upon their unique role in the criminal justice system, prosecutors generally are bound by their assurances, particularly when defendants rely to their detriment upon those guarantees.

*Id.* at 1134.

11

Regardless of whether the Commonwealth indeed made such a promise, it is seemingly nonsensical that a promise to sentence Defendant to 12 to 24 years if convicted at trial would somehow induce him to reject a plea deal of 5 to 10 years. Nevertheless, as set forth above, Defendant testified that, in the basement meeting soon before trial, Mr. Harrar promised that he would seek a sentence of twelve (12) to twenty-four (24) years of incarceration following a conviction at trial. Mr. Harrar testified that no such promise was given, and that providing such a guarantee would have had the effect of nullifying any prosecutorial leverage in the plea negotiations. Once again, the court is required to make a credibility determination. As with Mr. Kelly, Defendant has provided no concrete or explicit evidentiary basis upon which to conclude that Mr. Harrar was incredible, compared to Defendant's own personal interest in seeing his prison sentence curtailed.

Moreover, certain circumstantial evidence in the record weighs against the existence of the promise. In an email to Mr. Kelly (Commonwealth's Exhibit C-31), Mr. Harrar laid out the guideline ranges for the most serious charges in this case (attempted murder, two distinct counts of aggravated assault, and persons not to possess firearms). Based upon these guideline calculations, which have not been disputed, the absolute minimum guideline sentence for these crimes, if they were to be imposed concurrently, would be two hundred one (201) months, or sixteen (16) years nine (9) months, with a mitigated or aggravated range of twelve (12) months. Therefore, a sentence of 12 to 24 years

12

would fall below the mitigated range of the lowest possible sentence for a conviction on all charges in this case.

There is no reason whatsoever why any prosecutor, particularly an experienced litigator such as Mr. Hararr, would promise to sentence an individual below the mitigated range before the case even proceeded to trial – particularly in a case where the victim was almost killed when he was shot by an illegal handgun. Likewise, if such a promise was actually made, both Mr. Kelly and Defendant were present in the meeting to hear it. Therefore, common sense dictates that Mr. Kelly, Defendant, or both would have raised that issue with the court at the time of sentencing. Clearly, if such a promise had actually been made, defense counsel and Defendant himself would have vehemently objected to Commonwealth even arguing for a sentence of 25 to 50 years, not to mention the court actually imposing it.

There is no evidence, aside from Defendant's own assertion, that Mr. Harrar made any promise to cap the sentence the Commonwealth would seek if the case went to trial. We accept as credible the testimony of Mr. Harrar that he did not make the alleged promise to Defendant in the basement meeting. Such a guarantee would have not only been completely uncharacteristic of a competent prosecutor, but also would have been raised previous to this PCRA petition if it had actually existed. This claim is therefore denied.

The second claim raised by Defendant in his "Motion to Conform Pleadings" is as follows:

> Petitioner's Decision to Reject This and Other Favorable Plea Deals and Proceed to Trial Was Neither Knowing, Nor Intelligent, Nor

13

> Voluntary, Violating His Right to Make His Defense under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution.

As above, this claim rests upon the purported violation of Defendant's constitutional rights. According to Defendant, he was deprived of a "fundamental autonomy right to make his defense" due to Mr. Kelly's ineffectiveness, Mr. Harrar's failure to abide by his sentencing promise, or both. As set forth in detail above, we have rejected the legal basis upon which Defendant now claims he suffered a constitutional violation, rendering this claim likewise without merit.

Moreover, Defendant's assertion that he did not voluntarily choose to proceed to trial in this case due to the supposedly improper behavior of Mr. Kelly and Mr. Harrar is belied by Defendant's own statements to his family and friends prior to trial. In several of the recorded prison phone calls, including Commonwealth's Exhibits C-8 and C-14 and Petitioner's Exhibit P-15, Defendant clearly and unequivocally states his desire to reject any plea and go to trial. Mr. Kelly and Mr. Harrar likewise testified that Defendant rejected any plea, even after both of them were attempting to convince him to take a deal. It was Defendant's own bold choice to reject all plea offers against the advice of counsel and to the disappointment of the Commonwealth. Defendant cannot now accuse the very persons who were trying to get him to accept a plea of somehow depriving him of his right to make that decision – particularly when that advice was rejected. This claim is denied.

Returning to the petition itself, Defendant next claims that:

14

> Trial counsel ineffectively failed to investigate a surveillance system police seized from Petitioner's residence, the contents of which would have corroborated Petitioner's claim of self-defense.

In his brief, Defendant indicates that the Commonwealth turned over the surveillance system in question during PCRA proceedings. Defendant concedes that his own expert confirmed that no video recordings of this incident ever existed, as the Commonwealth had indicated prior to trial. Indeed, if such vivid and direct evidence of this incident was available at the time of trial, the Commonwealth certainly would have sought to present it to the jury. Accordingly, trial counsel was not ineffective for failing to investigate evidence which did not exist.

The following claim raised in Defendant's petition, as amended, asserts that:

> Trial Counsel Ineffectively Failed to Seek Admission of Evidence of Fletcher Grady's Character for Violence.

In a criminal case, "a defendant may offer evidence of an alleged victim's pertinent [character] trait[.]" Pa.R.E. 404(a)(2)(B). In a case "where self-defense is asserted, the defendant may introduce evidence of the turbulent or dangerous character of the decedent. This type of character evidence is admissible on either of two grounds: 1) to corroborate the defendant's alleged knowledge of the victim's violent character in an effort to show that the defendant reasonably believed that [his or] her life was in danger; and/or 2) to prove the allegedly violent propensities of the victim to show that the victim was in fact the aggressor." *Commonwealth v. Carbone*, 707 A.2d 1145, 1154 (Pa. Super. 1998) (citations omitted).

15

At the June 17, 2022 proceeding, Defendant admitted evidence that, in his belief, showed the "character for violence" of the victim, Fletcher Grady. Defendant claims this evidence should have been introduced at trial by Mr. Kelly to promote Defendant's theory of self-defense. First, Defendant admitted a police report, Petitioner's Exhibit P-6, that indicates that on one occasion the victim used the term "faggot." The use of a pejorative epithet, while offensive and unwise, does not necessarily imply a character for violence.

Defendant also presented the statement of Natalie Hargan, a friend of the victim, given during the investigation of this case (admitted as Petitioner's Exhibit P-7). During an interview by Detective John O'Hare of the West Chester Police Department, Ms. Hargan indicated that the victim could instigate fights when he was "drunk" and "rowdy," but also stated that the victim was not "rowdy" the night of the shooting.

This evidence only indicates that the victim had the *capacity* to be belligerent under certain circumstances, and does not give any detail on how often he would do so – a factor which is crucial in determining whether he had a propensity towards violence. Indeed, Ms. Hargan does not elaborate on the frequency of the victim getting "drunk" and "rowdy," and her statement leaves just as open the possibility that it was a rare occurrence rather than the victim's regular habit. Moreover, the victim did not even attempt to start an altercation with any person in this case. The conduct at issue was striking a locked door, which is similar, but not identical, to starting a "fight." Ms. Hargan even specifically indicated that the victim was not "rowdy" on the night

16

of the shooting. Contrary to Defendant's assertion, this statement does not support a conclusion that the victim was of a violent character.

Defendant also raises an incident involving the victim on February 21, 2016, approximately four months after the shooting, as evidence of his "violent character." In a police report admitted as Petitioner's Exhibit P-8, West Chester University Police Officer Jeffrey Lorish had an encounter with the victim in his dormitory that resulted in the victim being cited for underage drinking. Defendant consistently refers to this incident as a "violent encounter," but there is no basis upon which to make that conclusion. Even though Officer Lorish reported that he was "concerned for [his] safety" and threatened to deploy a taser, the final result of the incident was a citation of the victim for underage drinking. If this was truly a "violent encounter," then it is likely that additional criminal charges would have been filed. No charges aside from the underage drinking citation, not even summary disorderly conduct, were brought against the victim. The court cannot conclude that this incident was "violent," or demonstrated the victim's "character for violence," in absence of any criminal charges. The mere fact that the victim refused to follow the commands of a police officer when intoxicated does not automatically mean that he was predisposed to violence.

We cannot conclude that this evidence actually demonstrates that the victim had a "character for violence." Counsel was therefore not ineffective for failing to admit it at trial. This claim is therefore denied.

17

Defendant next claims that counsel was ineffective for failing to request a special jury instruction for a photograph of the victim's injuries:

> Trial Counsel Ineffectively Failed to Request an Inflammatory Photograph Instruction Concerning the Photo of Fletcher Grady's Stomach

"The test for determining whether photographs are admissible involves a two-step analysis." *Commonwealth v. Malloy*, 856 A.2d 767, 776 (Pa. 2004). "First a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." *Commonwealth v. Haney*, 131 A.3d 24, 37 (Pa. 2015), *quoting Commonwealth v. Tharp*, 830 A.2d 519, 531 (Pa. 2003). "Inflammatory" in this context is defined as "so gruesome it would tend to cloud the jury's objective assessment of the guilt or innocence of the defendant." *Commonwealth v. Funk*, 29 A.3d 28, 33 (Pa. Super. 2011).

Pennsylvania case law generally reserves the designation of a given photograph as "inflammatory" to graphic depictions of heinous acts committed directly upon a victim's person, such as vivid images of the destruction of recognizable parts of a human body. *See Commonwealth v. Mollett*, 5 A.3d 291 (Pa. Super. 2010) (interior of victim's skull following gunshot wound); *Commonwealth v. LeGares*, 708 A.2d 922 (Pa. Super. 1998) (effects of 20-gague shotgun blast on victim's head); *Haney, supra* (numerous bruises on a

18

deceased child due to a severe beating). Indeed, numerous cases have rejected an inflammatory designation for depictions of unpleasant, but not gruesome, subject matter. *See Commonwealth v. Solano*, 906 A.2d 1180 (Pa. 2006) (bloody shirt and shorts worn by victim at time of murder); *Commonwealth v. Spell*, 28 A.3d 1274 (Pa. 2011) (wide-angle shots that included victim's body and face); *Commonwealth v. Lowry*, 55 A.3d 743 (Pa. Super. 2012) (photographs of car accident victim in hospital prior to death); *Commonwealth v. Hutchison*, 164 A.3d 494 (Pa. Super. 2017) (child's corpse in bedroom).

At trial, the Commonwealth introduced a color photograph of the victim's injuries as a result of being shot by Defendant. The photograph was used at trial to explain the severity of the injuries inflicted, through the testimony of the victim himself and the doctor who performed life-saving surgery on the victim. The image depicts the surgical incision into the victim's abdomen, bound together by two distinct sets of staples. Three distinct portions of the victim's open flesh are visible between the staples.

We cannot conclude that this photograph was "inflammatory." First, there is crucial distinction in this case that is not present in the vast majority of cases involving inflammatory photographs – the victim is still alive. It is far easier for the minds and passions of a jury to become inflamed when gruesome photographs of fatal injuries are their only contact with the victim. This image is of the victim's abdomen following a medical procedure, and the visible flesh was exposed as a result of that procedure. It does not depict visceral damage to the victim's body caused by Defendant's conduct, nor does it show any blood

19

loss or splatter whatsoever. The victim's face is not shown, and the image is limited to that portion of his body affected by the gunshot wound and the resulting surgery. This visual evidence, while arguably unpleasant to view, is nowhere near as explicit and provocative as the examples set forth above.

As the photograph in question was not "inflammatory," counsel was not ineffective for failing to request a special jury instruction to alleviate any potential emotional impact on the jury. This claim is therefore denied.

The next claim involves the testimony of defense expert Dean Evans:

> Trial Counsel Ineffectively Failed to Elicit Opinion Testimony from Defense Forensic Locksmith Dean Evans that the Locking System of the Door at the Center of This Case Had Significant Tool Mark Damage Indicative of a "Tool Entry Attempt"

Preliminarily, we note that this witness was examined by Marissa Ramsay, Esquire, one of Mr. Kelly's co-counsel on this case. Defendant chose not to call Ms. Ramsay as a witness at the evidentiary hearing on his PCRA petition, which significantly handicaps the court in determining why certain testimony was or was not elicited at trial. Mr. Kelly testified that he did not believe Mr. Evans was a "compelling" witness, and permitted co-counsel Ms. Ramsay to handle his testimony.

The purpose of calling Mr. Evans was to buttress Defendant's claim of self-defense by presenting evidence about damage to the door to Defendant's carriage house. According to Defendant, this evidence supported the defense theory of the case, that the victim and his friends were making a serious attempt to break into Defendant's carriage house – thus he lawfully acted in self-defense when he shot through the door. Defendant claims that counsel

20

was ineffective for failing to elicit testimony on the following two conclusions present in Mr. Evans's report:

> The knob lock has a large dent on the lower exterior side closest to the frame. This dent is indicative of tool damage resulting from prying.
>
> …
>
> Tool mark damage is also present on the jamb's wooden frame, the door's wooden frame, the exterior side of the steel face and the knob lock latch.

Mr. Evans did in fact testify as to the damage to the knob lock and the wooden door frame. He indicated multiple times that there was damage on the door indicative of "atypical inward force" – striking, kicking, or throwing one's body weight into the door. He also noted a footprint on the door, possibly indicative of someone kicking the door. This testimony clearly provided the jury with an evidentiary basis upon which to consider Defendant's claim that individuals were attempting gain entry to the carriage house.

Defendant appears to argue that counsel was ineffective for failing to introduce Mr. Evans's ultimate conclusion that the damage was caused by "prying" or a "tool entry attempt." However, following multiple objections by the Commonwealth, the court restricted Mr. Evans to only testify about what types of conduct or tools could generally cause the damage on the door – he was not permitted to make specific conclusions as to what exactly inflicted the damage. Mr. Evans would have likely not been permitted to testify that certain damage on the door was "resulting from prying." He certainly would not have been allowed to make the conclusion that the condition of the door was as a

21

result of an "entry attempt." Accordingly, counsel was not ineffective for failing to elicit testimony that would not have been permitted by the court.

The purpose of this testimony was to support Defendant's claim that certain individuals, including the victim, were attempting to break into the carriage house. Even without the challenged conclusions, Mr. Evans testified that damage had been inflicted by the application of significant external force on the door – precisely what Defendant claimed had occurred on the night of the shooting. This claim is therefore denied.

Defendant next challenges counsel's performance during the prosecutor's closing argument:

> Trial Counsel Ineffectively Failed to Object to the Prosecutor's Improper Closing Argument

The standard that a prosecutor must follow when delivering their closing argument to the jury is well-established:

> [A]ny challenged prosecutorial comment must not be viewed in isolation, but rather must be considered in the context in which it was offered. Our review of a prosecutor's comment and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial. Thus, it is well settled that statements made by the prosecutor to the jury during closing argument will not form the basis for granting a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict. The appellate courts have recognized that not every unwise remark by an attorney amounts to misconduct or warrants the grant of a new trial. Additionally, like the defense, the prosecution is accorded reasonable latitude, may employ oratorical flair in arguing its version of the case to the jury, and may advance arguments supported by the evidence or use inferences that can reasonably be derived therefrom. Moreover, the prosecutor is permitted to fairly respond to points made in the defense's closing, and therefore, a proper examination of a

22

> prosecutor's comments in closing requires review of the arguments advanced by the defense in summation.

*Commonwealth v. Jaynes*, 135 A.3d 606, 615 (Pa. Super. 2016) (citations and quotation marks omitted).

Defendant claims that the prosecutor used four distinct types of improper argument during his closing. First, "the prosecutor personally assured the jury that witnesses who supported the Commonwealth's case were credible and those who supported Petitioner's defense were incredible." For improper bolstering of the credibility of witnesses to occur during a closing argument, "(1) the prosecutor must assure the jury the testimony of the government witness is credible, and (2) this assurance must be based on either the prosecutor's personal knowledge or other information not contained in the record." *Commonwealth v. Reid*, 259 A.3d 395, 429 (Pa. 2021), *quoting Commonwealth v. Williams*, 896 A.2d 523, 541 (Pa. 2006).

Defendant's argument that Mr. Harrar improperly commented on the credibility of witnesses appears to be largely based upon the repeated use of the first-person plural. The mere fact that a prosecutor uses first-person plural language when addressing the jury is not, in and of itself, improper. *See Commonwealth v. Stafford*, 749 A.2d 489 (Pa. Super. 2000) (prosecutor's use of the phrase "we think" not improper during closing argument). Mr. Harrar's use of first-person language did not carry with it his personal knowledge or belief surrounding any witnesses. Indeed, it appears that such statements as "we know" were in the same vein as the commonly-used "I submit" or other similar

23

rhetorical phrases that are used when an attorney wishes to draw the jury's attention to an inference that may logically be drawn from the evidence. In his brief, Defendant refers to each and every use of "we" in Mr. Harrar's closing argument as improper "vouching." In viewing the entirety of the Commonwealth's closing argument, it is clear that the use of the first-person plural was a rhetorical device arguing the evidence presented at trial, rather than an attempt to personally vouch for the credibility of witnesses. Mr. Kelly cannot have been ineffective for failing to object to something that was not improper.

Next, Defendant asserts that the prosecutor referred to facts not of record when addressing the jury. However, these statements did have basis in the testimony, and the alleged misstatements were inferences that Mr. Harrar was arguing could logically be drawn from that evidence. First, the prosecutor stated that certain witnesses were "friends" with other witnesses or individuals in the case. During his argument, the prosecutor indicated that Brian Nelson was "friends" with Tom Ramsay, Esquire, a prior counsel of Defendant and the father of defense co-counsel Marissa Ramsay, and that Corrinne Aberts was "friends" with Lauren Muntz, Defendant's girlfriend.

Defendant is technically correct that Mr. Nelson and Ms. Aberts did not explicitly testify that they were "friends" with Mr. Ramsay and Ms. Muntz respectively. Yet they did testify to personal relationships with those individuals, from which a "friendship" could certainly be inferred. Mr. Nelson testified "I know Tom Ramsay" and that Mr. Ramsay had previously

24

represented him in another proceeding. (N.T. 3/23/17, p. 70). Likewise, Ms. Aberts testified that she knew, and was the hairdresser of, Defendant's girlfriend, Lauren Muntz, and had repeatedly visited Defendant's carriage house that was the site of the shooting. Mr. Harrar was permitted to argue to the jury that these relationships may have biased these witnesses in favor of Defendant, and his use of the term "friend" was not impermissible.

Next, Defendant argues that Mr. Harrar inserted facts not in evidence surrounding the testimony of Raymond Rodriguez. The prosecutor insinuated that Mr. Rodriguez may have been paid to give testimony favorable to Defendant, stating *inter alia* "[m]aybe Ray got paid." (N.T. 3/24/17, p. 251). While there was no evidence presented at trial that Mr. Rodriguez was actually paid for his testimony, Defendant stated in a recorded prison phone call that he would give "ten stacks" to someone who would take ownership of the firearm and claim that they were present during the shooting. (N.T. 3/21/17, p. 113). Mr. Rodriguez, who had never given any statements to police, testified that he accidentally left the firearm used by Defendant at the carriage house the day prior to the shooting. He denied that he had been paid for his testimony, but did confirm that a "stack" referred to a thousand dollars. Moreover, Mr. Rodriguez had several *crimen falsi* convictions, specifically retail theft and forgery. Defendant's own words indicated his willingness to pay ten thousand dollars for favorable testimony regarding the ownership of the firearm. Mr. Rodriguez, a friend of Defendant tainted by *crimen falsi*, testified on that very topic. He denied that he had been paid for that testimony, but these

25

circumstances permitted Mr. Harrar to properly argue to the jury an inference of the possibility that such a payment may indeed have been made.

Defendant also claims that Mr. Harrar introduced facts not in evidence when referring to the type of bullet that struck the victim. Trooper Daryl Elias, the Commonwealth's firearms expert, testified that the bullet was "consistent with what's called an RIP, which stands for Radically Invasive Projectile" – a specific type of round designed to inflict the maximum possible damage on human flesh. (N.T. 3/23/17, p. 191). During his closing, the prosecutor referred to this type of projectile as a "Rest in Peace bullet." "RIP" is a common acronym for "Rest In Peace," and based upon the context Mr. Harrar was clearly speaking of the Radically Invasive Projectile and substituting a common dramatic phrase that shares the same acronym. Using "Rest In Peace" in place of "Radically Invasive Projectile," when both are abbreviated in the same manner, constituted permissible "oratorical flair."

Defendant next asserts that Mr. Harrar "injected issues broader than the guilt or innocence of the accused under the controlling law and were calculated to inflame the prejudices of the jury." Defendant claims that the prosecutor expressed an "inappropriate demand for the jury to seek vengeance" by stating "[d]on't let him get away with that." (N.T. 3/24/17, p. 256). Such language is permissible. *See Commonwealth v. DeJesus*, 860 A.2d 102 (Pa. 2004) (use of the phrase "[d]on't let [the defendant] get away with it" not improper).

Next, Defendant argues that Mr. Harrar violated the standards for closing arguments when he stated that he was "fired up" about Commonwealth

26

witness Brian Nelson, and that "if I get fired up over him, I think you should get fired up too. He tried to make a mockery of the justice system. He didn't tell you the truth." (N.T. 3/24/17, p. 250-51). Mr. Nelson was Defendant's landlord at the time of the shooting. Several photographs of text message conversations between Mr. Nelson and Defendant were admitted into evidence as Commonwealth's Exhibit C-17A through C-17D.

Immediately prior to Mr. Nelson's testimony, the defense provided several handwritten documents that purported to be Mr. Nelson's written recollections of additional text messages from Defendant that Mr. Nelson had deleted prior to permitting the police to examine his cellphone. These documents, which Mr. Nelson stated had been stored in a drawer since a few days after the shooting, were admitted as Defendant's Exhibits D-1 and D-2. In these recorded messages, Defendant repeatedly stated that multiple individuals were attempting to break into the carriage house, consistent with the defense theory of the case.

Mr. Harrar was entitled to argue a skepticism of Mr. Nelson possessing handwritten notes of deleted text messages to Defendant, particularly as they only came to light in the middle of trial. It is unclear exactly what Harrar meant by being "fired up" by this witness. One possible meaning is that Nelson's testimony angered Harrar, and if so, this would border on Harrar's saying that he personally disbelieved Nelson's testimony, which would be impermissible. On the other hand, if this was simply an oratorical exhortation to disbelieve Mr. Nelson's testimony, then it was a permissible attack on

27

Nelson's credibility. In either event, it was not so inflammatory as to have the "unavoidable effect" of instilling "prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict." Moreover, it is important to note that Nelson was a *Commonwealth* witness. While there is ample case law on a prosecutor's comments either supporting the credibility of a Commonwealth witness, or attacking the credibility a defense witness, there is a dearth of cases on the subject of a prosecutor attacking the credibility of his own witness. Defendant is not entitled to relief on this claim.

Finally, Defendant argues that "the prosecutor expressed his personal opinion regarding [Defendant's] credibility and strategy." As set forth above, Defendant largely bases this argument upon Mr. Harrar's frequent use of the first-person plural in his closing argument. We are not persuaded that such language, in and of itself, was intended to convey the prosecutor's personal opinion. Instead, Mr. Harrar was making permissible comments on Defendant's credibility. "A prosecutor's contention that a defendant lied is neither unfair nor prejudicial when the outcome of the case is controlled by credibility, the accounts of the victim and the defendant conflict, and defense counsel suggests that the victim is fabricating. Under such circumstances, 'it would be difficult to conceive of any other approach when closing to the jury.' " *Commonwealth v. Judy*, 978 A.2d 1015, 1024 (Pa. Super. 2009), *quoting Commonwealth v. Johnson*, 588 A.2d 1303 (Pa. 1991). Defendant exercised his

28

right to testify in his own defense during this trial, and the prosecutor was therefore entitled to comment on his credibility during closing argument.

In sum, the prosecutor's closing argument was not improper. Accordingly, counsel was not ineffective for failing to object to any of the challenged statements. Defendant is not entitled to relief.

Defendant's next PCRA claim, as amended, is as follows:

> Trial Counsel Ineffectively Failed to Object to the Serious Bodily Injury Special Interrogatory Associated with Petitioner's Attempted Murder Charge and to Petitioner's Illegal Conviction and Sentence for Attempted Murder; and Appellate Counsel Was Ineffective for Failing to Raise a Parallel Claim of Trial Counsel Ineffectiveness

Defendant argues that he was illegally convicted and sentenced for Attempted Murder with the "serious bodily injury caused" enhancement pursuant to 18 Pa.C.S. §1102(c). "[W]hen the Commonwealth intends to seek an enhanced sentence for attempted murder resulting in serious bodily injury under Section 1102(c), the Commonwealth must include a citation to the statutory provision as well as its language in the charging documents." *Commonwealth v. King*, 234 A.3d 549, 562 (Pa. 2020). Defendant is correct that Section 1102(c) was not explicitly cited in the criminal information in this case, nor was any formal notice given by the Commonwealth on the potential use of the §1102(c) enhancement. However, this does not end our inquiry, as both the Commonwealth and Defendant cite *King* as authoritative on this issue.

In *King*, the defendant was charged with attempted murder after allegedly firing nine shots at an individual, shattering her hip and ankle. The Commonwealth charged the defendant with attempted murder, but did not

29

formally give notice of intent to use the §1102(c) enhancement. The defense at trial was that the defendant was not the shooter, and indeed he stipulated that the victim suffered "a shattered hipbone and anklebone, requiring multiple surgeries and high intensity inpatient occupational and physical therapy." *Id.* at 553. Both the Commonwealth and the defendant agreed on the content of the verdict slip, which contained an explicit interrogatory that, if the defendant was found guilty of attempted murder, whether the jury found beyond a reasonable doubt that the victim had suffered serious bodily injury.

The defendant was convicted of attempted murder, and the jury found that the victim suffered serious bodily injury. On appeal, the defendant argued that, as the Commonwealth had never formally notified the defendant that the §1102(c) enhancement was being sought, his sentence pursuant to that enhancement (not less than twenty (20) nor more than forty (40) years of incarceration) was illegal.

The Pennsylvania Supreme Court held that the charging documents were facially inadequate and failed to give the defendant formal notice that he was being prosecuted for the distinct and aggravated crime of attempted murder using the §1102(c) sentencing enhancement. However, the Court held that the circumstances of the case, which clearly illustrated that the §1102(c) enhancement was in play, rendered the Commonwealth's failure to provide formal notice meaningless:

> Having found that the criminal information failed to adequately apprise [the defendant] of the Commonwealth's intention, we turn to the question of remedy. As acknowledged by both parties, the element of serious bodily injury in connection

30

with attempted murder was indeed submitted to the jury and found beyond a reasonable doubt as indicated on the jury's verdict sheet. The question becomes whether the absence of that fact from the indictment or information requires a finding that the resulting sentence for the aggravated crime was illegal.

We hold that it does not. That the Commonwealth's information was insufficient as a matter of due process notice does not resolve whether the conviction at trial was illegally secured. As previously noted, the indictment sets the stage for trial and what the Commonwealth intends to prove. For the following reasons, we conclude that [the defendant] was adequately apprised through other means of the Commonwealth's intentions and that the charging error was harmless beyond a reasonable doubt.

...

Since a proper notice would permit the sentence, we agree that the instant error is amenable to harmless error review. We further find that the Commonwealth has met its burden of establishing that the error was harmless beyond a reasonable doubt. [The] evidence of serious bodily injury in this case was overwhelming and uncontroverted. Moreover, this is not a case where the judge made the requisite finding...but rather it was stipulated to and found by the jury beyond a reasonable doubt. [The defendant] never contested the severity of [the victim's] injuries, but rather stipulated that, as a result of two gunshot wounds, [the victim] suffered a shattered hipbone and anklebone, requiring multiple surgeries and high intensity inpatient occupational and physical therapy. While [the defendant] did not receive formal notice of the Commonwealth's intent to seek the enhancement, [the defendant] received *de facto* notice, at various points before trial, that the Commonwealth was seeking the enhancement. For example, the factual summaries in the charging documents made clear that [the victim] suffered serious bodily injury. Moreover, the Commonwealth advised [the defendant] that the minimum penalty for attempted murder if convicted was seventeen and one-half years, signaling that the Commonwealth intended to seek the enhancement. Finally, the Commonwealth and [the defendant's] attorney reviewed and agreed to the content and form of the verdict sheet prior to jury deliberations, which included a special interrogatory regarding whether [the victim] suffered serious bodily injury as a result of the attempted murder.

We also find persuasive the Commonwealth's point that its failure to provide formal notice of its intent to seek the enhanced sentence did not affect [the defendant's] choice of defense or execution of that defense, considering [the defendant] stipulated to

31

> [the victim's] injuries and instead sought to demonstrate that another unknown individual committed the crime. Therefore, the harmless nature of the error precludes a finding that the sentence was illegally imposed.

*Id.* at 563, 566.

The circumstances in this case are strikingly similar to those found in *King*. The evidence of serious bodily injury in this case was "overwhelming and uncontroverted" – the victim suffered a gunshot wound to his abdomen that required intensive, life-saving trauma surgery. While Defendant did not formally stipulate to the victim's injuries as in *King*, he did not contest or challenge the severity thereof in any way throughout the trial. The defense case was grounded in self-defense, not the degree to which the victim was injured.

Likewise, the presence of serious bodily injury was found by the jury, not the court. Defendant argues that this case is distinguishable from *King* because that finding was not beyond a reasonable doubt. However, in its closing charge to the jury, the court referenced no fewer than eight (8) times that the jury's entire verdict must be beyond a reasonable doubt. It would be nonsensical for the jury to receive repeated instructions that their verdict must be beyond a reasonable doubt, but then fail to apply that standard to an element of the verdict slip. Indeed, the verdict slip does not explicitly reference that the verdict on *any* of the charges must be beyond a reasonable doubt – further demonstrating that beyond a reasonable doubt was the sole legal standard that the jury was to apply.

32

Defendant also received *de facto* notice prior to trial that the Commonwealth was proceeding under the §1102(c) enhancement, in the same ways that the defendant in *King* did. At the preliminary hearing on December 8, 2015, the date that Attempted Murder was added to the charges in this case, multiple witnesses testified on the extent of the victim's injuries. Officer Jerry Ferriola of the West Chester Police Department, one of the first officers to arrive on the scene, described his initial observations of the victim:

> Q. Were you able to determine where on his body he was shot?
>
> A. ... The victim was laying on his back, and had his T-shirt pulled up toward his neck, and he had an entrance of what appeared to be an entrance would just below his left nipple on his – not on his side, but between his chest and side.
>
> Q. Were you able to see an exit wound?
>
> A. I did not observe an exit wound.
> ...
>
> Q. And what did you do when you observed this young man laying on the ground with a gunshot wound?
>
> A. I talked to him, tried to keep him conscious and alert. I assessed the injury. There was no active bleeding from the wound, so I just made sure that he tried to stay as still as possible. Not seeing an exit wound, I wasn't sure what had gone into him, and if it came out. And if it was still in him, I didn't want him moving around to cause further injury internally, so I just tried to keep him as still as possible and kept talking to him.

(N.T. 12/8/15, p. 7-8). Likewise, Detective Sergeant Louis DeShullo, also of the West Chester Police, testified on his investigation into the victim's injuries:

> Q. ... As part of the investigation, did you have an opportunity to follow-up on the nature of the injuries that were suffered by the young man who was shot?
>
> A. Yes.

33

Q. Can you describe for the court and the record, an overview of the nature of those injuries suffered by the young man whose name is Fletcher Grady?

A. Yes. He – a bullet entered the left side of his torso, proceeded through his body striking his colon, small intestine and lodging inside of his body on the right side.

Q. And did he have to have surgery to address the injuries he suffered?

A. He did, and he is still recovering today.

Q. He is in the process of recovering?

A. Correct.

Q. But these injuries were to his torso, his center mass?

A. Correct.

(N.T. 12/8/15, pp. 29-30).

Also as in *King*, the Commonwealth referenced the enhancement during plea negotiations. In Commonwealth's Exhibit C-31, the email from Mr. Harrar to Mr. Kelly, Mr. Harrar outlined the guideline range for attempted murder *with* the serious bodily injury caused enhancement when presenting the sentencing guidelines for the most serious charges in this case. Likewise, Mr. Harrar made the following explicit statement that the victim suffered serious bodily injury:

> I should note that Mr. Grady suffered serious bodily injury in this case- As a result of being shot by your client Mr. Grady was taken to Paoli Hospital where he had the following procedures:
>
> > 1. Exploratory Lap- (Abdomen is opened and the organs are examined for injury or disease)

34

2. Transverse Colon Injury- (There are essentially 3 parts to the large intestine the colon cuts across the body horizontally like an arch moving the food to the descending colon the final stop before the rectum)

3. Small Bowel resection with primary anastomosis as well as bullet removal and mobilization of the splenic flexure- (part of his small intestine needed to be removed as a result of the gunshot injury).

He was discharged on 11/12/2015 after spending at least 11 days in the ICU. I am fairly confident that I will be able to prove that serious bodily injury was caused... .

(Commonwealth's Exhibit C-31, p. 3).

Finally, counsel for Defendant extensively participated in the charging conference, where the court and counsel worked through and agreed upon the precise language of the jury charge and the verdict slip – including the serious bodily injury interrogatory. In sum, Defendant in this case received virtually the identical notice of the §1102(c) enhancement that was received by the defendant in *King* and thereafter approved of by the Supreme Court. Moreover, like *King*, the defense in this case was not affected by the Commonwealth's decision to use the enhancement – in this case it was self-defense, in *King* it was that another individual committed the crime. Neither of those defenses is affected or influenced by the severity of the victim's injuries. Defendant additionally cites the cases of *Commonwealth v. Johnson*, 910 A.2d 60 (Pa. Super. 2006), *Commonwealth v. Barnes*, 167 A.3d 110 (Pa. Super. 2017), and *Commonwealth v. Bickerstaff*, 204 A.3d 988 (Pa. Super. 2019) in support of his claim. However, these cases are distinguishable from this case in the same way that they were distinguishable from *King*:

35

> The juries in *Johnson* and *Barnes* never determined whether the defendants' attempted murder offenses resulted in serious bodily injury. Additionally, unlike the circumstances in *Bickerstaff*, [Defendant] was not ambushed by the verdict sheet including an interrogatory regarding serious bodily injury associated with attempted murder.

*King, supra,* at 559.

Accordingly, we conclude that Defendant's conviction and sentence for Attempted Murder using the serious bodily injury enhancement were not illegal. Counsel was not ineffective for failing to object thereto, and Defendant is not entitled to relief on this claim.

Finally, Defendant claims that he was prejudiced by the cumulative effect of counsel's purported errors:

> Petitioner Was Denied His Right to Effective Assistance of Counsel and His Right to Due Process Based on the Cumulative Prejudicial Effect of Counsel's Deficient Performance Asserted Herein.

"When the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed." *Commonwealth v. Spotz,* 18 A.3d 244, 321 (Pa. 2011). However, "no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually." *Commonwealth v. Elliott,* 80 A.3d 415, 450 (Pa. 2013), *citing Commonwealth v. Busanet,* 54 A.3d 35 (Pa. 2012). In this case, we have determined that none of the claims of ineffective assistance raised in this petition were of arguable merit. Therefore, none of these individual claims have been denied based upon a lack of prejudice, and there is no cumulative prejudicial effect to consider. Defendant is not entitled to this relief.

36

For all those reasons, the court will enter the following Order:

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

: CHESTER COUNTY, PENNSYLVANIA

v. :

: CRIMINAL ACTION

JAMES MAURICE CANNAVO, JR. : CR-4483-15

Leslie Pike, Esquire, Assistant District Attorney for the Commonwealth
Jonathan Cioschi, Esquire, Counsel for Defendant

## ORDER

AND NOW, this 30th day of March, 2023, following the hearings conducted on March 14, June 17, and August 3, 2022, and upon review of Defendant's brief filed on November 28, 2022 and the Commonwealth's brief filed on January 27, 2023, it is hereby ORDERED and DECREED that:

1. Defendant's November 28, 2022 "Motion to Conform Pleadings to the Evidence Developed at the Petitioner's PCRA Evidentiary Hearing" is GRANTED; and

2. Defendant's "Petition for Post-Conviction Relief Pursuant to The Post-Conviction Relief Act, 42 Pa.C.S. §9541 *et seq.*," filed on October 20, 2020, is DISMISSED.

Pursuant to the requirements of Pa.R.Crim.P. 908(E), Defendant is advised that this is a final Order disposing of his PCRA petition, and that he has thirty (30) days from the date of this Order to file an appeal to the Superior Court of Pennsylvania with the Clerk of Courts of Chester County.

The Clerk of Courts of Chester County is ORDERED to serve a copy of this Order upon the following:

(a)     District Attorney of Chester County.

(b)     Defense Counsel.

(c)     Defendant – **by Certified Mail, Return Receipt Requested.**

BY THE COURT:

David F. Bortner, S.J.

39